1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  FERNANDO GARCIA-SANTOS,            No.  1:16-cv-00362-AWI-JLT (HC)

12            Petitioner,             **FINDINGS AND RECOMMENDATION
                                      TO DENY PETITION FOR WRIT OF**
13      v.                            **HABEAS CORPUS**

14  CALIPATRIA PRISON WARDEN,         **[TWENTY-ONE DAY OBJECTION
                                      DEADLINE]**
15            Respondent.

16

17      Petitioner is currently serving an indeterminate sentence of life without the possibility of

18  parole plus 25 years to life for his conviction of murder and robbery in association with a criminal

19  street gang.  Petitioner has filed the instant habeas action claiming the trial court in several

20  respects. As discussed below, the Court finds the claims to be without merit and recommends the

21  petition be **DENIED.**

22  **I.      PROCEDURAL HISTORY**

23      Petitioner was convicted in the Kern County Superior Court on August 8, 2012, of first

24  degree murder (Cal. Penal Code § 187(a)), robbery (Cal. Penal Code § 211), discharging a

25  firearm at an occupied motor vehicle (Cal. Penal Code § 246), and being an active participant in a

26  criminal street gang.  (Cal. Penal Code § 186.22(a)).  People v. Toscano, No. F065808, 2015 WL

27  5062831, at *1 (Cal. Ct. App. Aug. 27, 2015), *as modified* (Sept. 15, 2015).  The jury also found

28  true allegations that the murder was done with deliberation and premeditation (Cal. Penal Code §

                                      1

189), that the crime was committed while Petitioner was an active participant in a criminal street gang and was carried out to further activities of the gang (Cal. Penal Code § 190.2(a)(22)), and that the crime was committed during a robbery (Cal. Penal Code § 190.2(a)(17)(A)).  Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  The Fifth DCA affirmed the judgment on August 27, 2015.  Id.  The appellate court modified the opinion to correct a minor error on September 15, 2015; however, the judgment was unaltered.  Id.  Petitioner filed a petition for review in the California Supreme Court, and the petition was summarily denied on November 24, 2015.  (LD[1] 18, 19.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

### Events of August 28, 2010 (counts 6–8)

Ramzee Johnson, an African–American man in his mid-thirties, lived with his family in a predominately Hispanic neighborhood in northeast Bakersfield. Around 3:00 a.m., on August 28, 2010, Johnson left his apartment to walk to an AM/PM market.

Shortly after leaving his apartment, Johnson saw appellant Aguero and Francisco Castro standing about a block and a half away. When Aguero and Castro started walking towards him, Johnson became nervous and began walking back to his apartment.

Aguero and Castro were walking faster than Johnson and soon overtook him. They then stood in front of him and started asking him "gang questions" like "where you from?" and "where you at?" Johnson replied he was "not from anywhere" and made statements to the effect he lived on the street where they were standing and that they were in front of his residence.

Castro suddenly pulled out a .25–caliber, semiautomatic firearm and Johnson heard a clicking sound, indicating the gun had been cocked. Believing he was about to be killed, Johnson grabbed for the gun. Although the gun fired as soon as he grabbed it, the shot missed him. Johnson then twisted the gun out of Castro's hand and fired it back at Castro. Aguero and Castro fell to the ground and then quickly got up and ran away. Johnson fired the gun in their direction several times until he heard a click and the gun appeared to be empty. Johnson then called 911 and the police soon arrived.

When the police arrived, some people in front of a nearby residence started yelling at the officers that their friends inside were shot and were bleeding. The police

---

[1] "LD" refers to the documents lodged by Respondent with the answer.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

found Aguero and Castro inside the residence. They both had gunshot wounds and were lying on couches. Also present in the residence at this time were Jacob Gonzales, appellant Gonzales's brother, and Jacob Toscano, appellant Toscano's brother.

Aguero and Castro were transported to the hospital for treatment of their gunshot wounds. When a police officer returned to the hospital on August 30, 2010, to transport Aguero to jail for booking, the officer discovered that nursing staff had accidentally released Aguero from the hospital. Efforts to locate Aguero, prior to the April 30, 2011, incident underlying counts 1 through 5, were unsuccessful.

### Events of April 30, 2011 (counts 1–5)

The fatal shooting of Gerardo V. on April 30, 2011, occurred in a church parking lot in west Bakersfield. The parking lot was located next to a restaurant where Gerardo and some of his high school friends had gone that night to attend a quinceañera for a girl from their school.

In support of its theory that the shooting was an act of gang-related retaliation, the prosecution presented evidence that, six days earlier, on April 24, 2011, perpetrators, who shouted either "Westside" or "Southside," shot at Toscano and his brother, Jacob Toscano, resulting in injury to Jacob.

Christopher Wong, a deputy with the Kern County Sheriff's Department, testified he was dispatched to Bernard Street on April 24, 2011, in response to a "shots-fired call." When he arrived around 12:13 a.m., Wong found Jacob lying on the street with gunshot wounds to his right lower leg and upper left thigh. Toscano told Wong he had carried Jacob there from the intersection of Knotts and North King Streets, which was a little over a block away.

Toscano told Wong that he and Jacob had been walking home from the 7–Eleven on North King, near Knott Street, when a car pulled up next to them and several African–American males exited the car and shot at them. When the assailants exited their car, they were shouting "Southside." Toscano told Wong he responded by "gangbanging back at them" and yelling "Hillside." Wong explained that "Hillside" refers to a sect of the Loma Bakers gang in the Hillside area of Bakersfield, which is located around North King and North Tulare.

Jessica Castellanos testified that, around midnight on April 24, 2011, she was visiting her boyfriend at his apartment on Knott Street, when she heard a car loudly approach, blaring music. Castellanos looked out the window and saw two males standing by her car on the street. The taller of the two looked like he might be African–American, and the shorter male was wearing a brown jacket.

The two males Castellanos saw were angrily yelling "gang things" back and forth to some other people outside her view. At least one of the two males yelled, "Westside." Castellanos could not remember specifically what the others were yelling, just that they were yelling something gang-related.

Castellanos then saw the male in the brown jacket kneel down and reach into his pocket. Castellanos heard two more gunshots and quickly moved away from the window. Castellanos heard five more gunshots a little later in the night.

Sherriff's Deputy Angelo Gonzalez was dispatched shortly after midnight to assist Wong. Gonzalez testified he spoke with Castellanos and she described seeing two

3

African–American males standing in front of her car before she heard gunshots. Castellanos also said she heard one of them yell out "Westside" as they were looking towards the area of North King Street and Knotts Street. She then saw the shorter male reaching into a pocket for what she thought was a gun, after which she heard two gunshots. Approximately 10 to 15 minutes into his interview with Castellanos, Gonzalez heard some gunshots north of where they were.

In the days after the April 24, 2011 shooting, Melina M., a 16–year–old who knew Toscano through her adult half-sister, Ashley, overheard Toscano and Ashley talking about Jacob being shot. Toscano appeared very angry and she heard him say "something about the Westside."

On the afternoon of April 30, 2011, Melina saw Toscano in Jefferson Park, and invited Toscano to attend her friend's quinceañera. Aguero was standing next to Toscano when Melina invited Toscano. At that time, Toscano did not appear interested and Melina did not expect him to come. Later that night, however, after Melina and Toscano exchanged a series of text messages, he and the other appellants, and a fifth "boy" Melina recognized but whose name she did not know, showed up outside the restaurant where the quinceañera was being held and Melina went out to meet them.

Melina became upset with Toscano when he started leading the others in his group in "pretending" to be members of the Westside Bakers gang. Melina knew Toscano was actually an "Eastsider" and member of the rival Loma Bakers gang. Melina testified (and other trial witnesses confirmed) Toscano and his friends were shouting "Westside" and directing Westside hand signals towards males connected with the quinceañera, who were socializing around the restaurant and the adjacent minimarket. Melina also heard Toscano and others in his group saying, "pretend, pretend." Toscano warned Melina in front of the others not to tell anyone they were from "the East." He also revealed to her that he was armed by lifting up his shirt and exposing the handle of a firearm tucked inside his pants.

Melina asked Toscano to leave and went back inside the restaurant where the quinceañera was still underway. From inside the restaurant, she watched appellants' group leave. They crossed in front of the restaurant and then started walking towards the church parking lot. The murder victim, Gerardo, and three of his friends, Francis R., Eduardo P. (Eddie), and Eduardo G. (Edward), were already in the church parking lot, standing outside Francis's Volkswagen Beetle, waiting for Francis to manually unlock the car's doors so they could get in, when appellants' group suddenly approached and surrounded them. The parking lot was otherwise vacant of people, and Eddie recalled feeling intimidated by appellants' group.

Led by Toscano, appellants' group started asking Gerardo's group where they were from and Gerardo's group responded by saying "we don't bang." Maintaining the pretense that they were West Side Bakers, Toscano and the others is his group started making derogatory comments about Eastsiders (i.e., members of appellants' gang) and asking Gerardo's group where they could find some Eastsiders. Gerardo's group continued to respond by repeating they did not bang.

Eventually, appellants' group shook hands with Gerardo's group and appeared to be preparing to leave. In the meantime, Gerardo's group got inside Francis's car, with Francis sitting in the driver's seat, Gerardo in the front passenger's seat, Edward in the backseat behind Francis, and Eddie in the backseat behind Gerardo. After they were all in the car, Eddie noticed the passenger-side door where

Gerardo was seated was still open. Eddie then heard Toscano say "Keep it Westside," to which he heard Gerardo reply, "I'm Westside, too."

According to Eddie's testimony, after Gerardo said he was Westside too, Gonzales came up to the car and asked Gerardo what he had just said. When Gerardo repeated he was from the Westside too, Gonzales replied, "You're not from my hood", and challenged Gerardo to get out of the car and fight him.

Gonzales was soon joined by Toscano and the others in appellants' group in verbally challenging Gerardo to get out of the car and fight. They were also saying things to "pump up" Gonzales, including: "Just fight him. Just fight him." Gerardo's friends told Gerardo to be quiet and Francis started up his car; however, Francis could not drive anywhere without hitting someone because appellants' group had surrounded the car.

While their recollections of events differed in some details, Eddie, Edward, and Francis consistently testified to seeing Gonzales reach into the car and grab Gerardo's cell phone from out of his hands or off his lap. As Gonzales grabbed the cell phone, Eddie heard him call Gerardo a "bitch" and say "give me your fucking phone."

According to Eddie's testimony, after Gonzales took Gerardo phone, Gerardo started "begging" him to return it. Gonzales responded by saying something to the effect that he would return Gerardo's phone, but first Gerardo would have to get out of the car and fight him. Meanwhile, appellants' group continued to challenge Gerardo to get out of the car and fight with Gonzales.

Remaining inside the car, Gerardo continued imploring Gonzales to return his cell phone and repeating that he did not want to fight Gonzales. Gerardo also expressed some confusion, asking Gonzales why they were supposed to be fighting when they were supposed to be from the "same hood."

Eventually, Gonzales reached into the car again and grabbed Gerardo's hat from off his head. Eddie heard Gerardo tell Gonzales to keep the hat but to give him back his phone. Gerardo continued to complain about his phone and his friends urged him to be quiet and to close his car door. Before Gerardo finally closed his door, Eddie heard him say, "I'm going to call the big [homeys]."

After Gerardo said he was going to call the big homeys and closed his door, Toscano walked back up to the car and opened Gerardo's door. Toscano then pulled out a gun and shot Gerardo. Eddie explained that Toscano did not have to walk far to open the car door because, right before Gerardo closed it, Toscano and the rest of appellants' group were still surrounding Francis's car. When Toscano opened the car door to shoot Gerardo, Eddie saw Gonzales standing "right next to [Toscano]" and the other appellants "a few feet away from him."

After the shooting, appellants ran together towards a nearby alley, shouting something as they ran. Meanwhile, Gerardo got up out of Francis's car and started running towards the restaurant. Gerardo collapsed outside the restaurant and died shortly thereafter from a gunshot wound to his left shoulder. The pathologist who performed the autopsy explained that Gerardo suffered extensive blood loss due to the laceration of vital organs, including a major vein in his heart and the upper lobes of both his lungs.

***Gang expert testimony***

5

Kern County Sheriff's Deputy Richard Hudson testified as a gang expert for the prosecution. Hudson opined that, at the time of their offenses, appellants, codefendant Albarran, Jacob Toscano, and Francisco Castro (Aguero's accomplice in the August 2010 offenses) were all members of, and active participants in, the Loma Bakers criminal street gang.

Presented with hypotheticals based on the evidence of the August 2010 and April 2011 incidents underlying the charged offenses, Hudson opined the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. With respect to the gang-benefit of the April 2011 offenses, Hudson opined that the scenario presented was an act of retaliation and explained:

> "When an individual is put in a situation where a gang is going to require retaliation, when they conduct that retaliation they're going to create status, fear within the neighborhood, because this incident will be talked about. It will be discussed. People will hear about it in schools. They'll hear about it in the neighborhood. It will get around.

> "So the information will get out to other gangs, as well as the neighborhood, that these individuals, when disrespected, will, in this case, kill you, and by doing that they're going to limit the amount that people will be willing to testify; that other gang members will be willing to come to their neighborhood and disrespect them."

Regarding his opinion that the offense were committed in association with a criminal street gang, Hudson specifically testified:

> "Based on the hypothetical, all the members acted together to accomplish a goal. They traveled together to rival territory. They all pretended to be Westside together. They all took part in that. They attempted to identify—through the hypothetical attempted to identify rivals. Once they did they all acted together by moving as a group from one point to another to confront those individuals that they perceived to be rivals. They also confronted them by both words, surrounding, and then this violence escalated together as they continued to support each other. And then when the cell phone and hat was taken, while the others were present, they continued to be verbally and physically supportive and backing that individual, continuing to say different statements. And then the mere numbers of surrounding is an intimidation. And then during the shooting all the other individuals were still present by the shooter and they all fled together."

*The defense*

Harlan Hunter, a private investigator and former public defender investigator, testified as a gang expert on behalf of Gonzales. Hunter opined that on April 30, 2011, Gonzales was not a member of, or an active participant in, the Loma Baker criminal street gang.

Assuming the same hypothetical facts based on the April 2011 incident, as those addressed by the prosecution's gang expert, Hunter opined that the shooting was a "personal incident" and was "not done for the benefit of a gang, but ... was actually done for the benefit of the shooter, who basically had come there already upset about a previous shooting of his brother, and at that particular time decided that he was going to shoot the victim."

Harlan further opined:

> "[T]here's nothing in that hypothetical that supports any notion, idea, [or] knowledge that the other parties who were with the shooter had knowledge that the shooter was going to shoot the victim. [¶] And so again, it's my opinion on that particular day that this was not done for the benefit and in association with these other individuals, but done by an individual who basically was angered by this threat of don't make me get my big homeys, which is akin to don't make me go get my friends and come back and deal with you, became upset and shot the victim."

Toscano, 2015 WL 5062831, at *2–6.

### III.    DISCUSSION

#### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

#### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

7

1  Williams, 529 U.S. at 412-413.

2      A state court decision is "contrary to" clearly established federal law "if it applies a rule

3  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

4  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

5  different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

6  406).

7      In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

8  an "unreasonable application" of federal law is an objective test that turns on "whether it is

9  possible that fairminded jurists could disagree" that the state court decision meets the standards

10  set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

11  application of federal law is different from an incorrect application of federal law.'"  Cullen v.

12  Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

13  a federal court "must show that the state court's ruling on the claim being presented in federal

14  court was so lacking in justification that there was an error well understood and comprehended in

15  existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

16      The second prong pertains to state court decisions based on factual findings.  Davis v.

17  Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

18  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

19  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

20  facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

21  U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

22  factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

23  among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

24  1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

25      To determine whether habeas relief is available under § 2254(d), the federal court looks to

26  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

27  Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

28  2004).  "[A]lthough we independently review the record, we still defer to the state court's

8

ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Claims

The instant petition presents the following grounds for relief: 1) The state court unreasonably rejected Petitioner's claim that insufficient evidence supported the force or fear element of his robbery conviction and robbery-murder special circumstance finding; 2) The state court unreasonably rejected Petitioner's claim that the trial court improperly allowed a gang expert to testify regarding Petitioner's knowledge and intent during commission of the crimes; 3) The state court unreasonably rejected Petitioner's claim that the trial court erred by instructing the jury with CALCRIM No. 400; and 4) The state court unreasonably determined that the erroneous instruction on natural and probable consequences doctrine was harmless beyond a reasonable doubt.

1.     Insufficient Evidence

Petitioner first claims that the state court unreasonably rejected his claim that there was insufficient evidence to support the robbery conviction and the robbery-murder special circumstance. He claims there was insufficient evidence that the victim's hat and phone were taken by force or fear beyond that which was used for the mere taking of the property.

Petitioner presented this claim to the state courts on direct review. In the last reasoned decision, the Fifth DCA rejected the claim, as follows:

> In challenging the sufficiency of the evidence to support their convictions of robbery and the robbery special circumstances findings, all four appellants challenge the sufficiency of the evidence to establish that Gonzales committed the crime of robbery. . . .
>
> **A. Standard of review**
>
> In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the

9

judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) We accept the logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise. (*Ibid.*) Our review is the same in a prosecution primarily resting upon circumstantial evidence. (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*)

### B. *"Fear or force" and "intent to permanently deprive"*

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Thus, the elements of robbery are: (1) the taking of personal property (2) from a person or the person's immediate presence (3) by means of force or fear, (4) with the intent to permanently deprive the person of the property. (*Ibid.*; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) Appellants contend the evidence was insufficient to establish the third and fourth elements of robbery.

With respect to the third element, appellants assert that Gonzales's simple act of reaching inside the car and grabbing or snatching Gerardo's cell phone and hat was insufficient to prove Gonzales accomplished the taking of Gerardo's property by means of force or fear. However, "the requisite force or fear need not occur at the time of the initial taking. The use of force or fear to escape or *otherwise retain even temporary possession of the property* constitutes robbery." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 771–772, italics added.)

Even assuming the requisite force or fear did not occur at the time of the initial taking, the record discloses substantial evidence that Gonzales used force or fear to retain possession of Gerardo's property and therefore the evidence was sufficient to satisfy the third element of robbery. It is evident from the record that Gerardo dearly wished to recover possession of his cell phone and the jury here could have reasonably inferred from all the circumstances that he would have attempted to reclaim his phone but fear prevented him from doing so. Gerardo's fear was evident in his obvious reluctance to leave the shelter of Francis's car to try to reclaim his phone, and the evidence supports a reasonable inference that Gonzales and the other appellants intentionally engaged in intimidating behavior to instill fear in Gerardo to help Gonzales retain possession of, and eventually carry away after the shooting, the items he initially snatched away from Gerardo. Such behavior included standing together in close proximity to the car and encouraging and participating in Gonzales's continuing challenges to the victim to get out of the car and fight.

We likewise conclude there was sufficient circumstantial evidence from which the jury could reasonably infer that Gonzales intended to permanently deprive Gerardo of his property and thus satisfy the fourth element of robbery. It is well established that the intent with which a person acts is rarely susceptive of direct proof and usually is inferred from the factual circumstances of the offense. (Former § 21, subd. (a), § 29.2; *People v. Massie* (2006) 142 Cal.App.4th 365, 371.) Although Gonzales reportedly said he would return Gerardo's cell phone if Gerardo first got out of the car to fight him, the jury was not required to credit, and could have reasonably doubted the sincerity of, Gonzales's statements, especially in light of

evidence appellants had already engaged in deception that night (i.e., pretending to be members of a rival gang) to target the victim, and conclude that Gonzales intended to deprive the victim permanently of his property whether or not he succeeded in luring the victim out of the car.

Toscano, 2015 WL 5062831, at *9–10.

a.  Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no

11

rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 3-4.

         b. <u>Analysis</u>

In this case, the state court applied the correct standard; therefore, the only question is whether the state court's application was objectively unreasonable. Id.

The state court set forth the statutes defining robbery (Cal. Penal Code § 211) and determined that the evidence satisfied each element, particularly the third and fourth elements challenged by Petitioner. Petitioner contends that no force or fear was used in seizing the cellphone and cap aside from the actual force used to seize the items. His arguments are meritless, since there was substantial evidence from which a jury could find the defendants used both force *and* fear, though the prosecution needed only to prove one.

As correctly stated by Respondent, the force or fear used to commit the robbery need not occur only at the time of the taking. <u>People v. McKinnon</u>, 52 Cal.4th 610, 686 (2011). Force or fear used to retain the property once appropriated also qualifies. <u>People v. Gomez</u>, 43 Cal. 4th 249, 256 (2008). To constitute a robbery, the force used must be more than what is needed to accomplish the actual seizing of the property. <u>People v. Anderson</u>, 51 Cal.4th 989, 995 (2011). A robbery is committed when an amount of force is used that is "sufficient to overcome the victim's resistance." <u>People v. Burns</u>, 172 Cal.App.4th 1251, 1259 (2009). As to the element of fear, an express threat is not required; mere intimidation is sufficient. <u>People v. Morehead</u>, 191 Cal.App.4th 765, 775 (2011).

In this case, as noted by Respondent, Petitioner and his six friends harassed and intimidated the victim and his three friends, who were younger and smaller, throughout the night. (RT 1858-1862; 2655-2661.) The six defendants followed the four victims and surrounded them while they got into their car. (RT 1446-1447; 1877-1880.) The defendants continued to harass

the victims and challenge them. (RT 1882-1887; 2372-2375; 2381-2384.) At one point co-defendant Toscano challenged victim Gerardo to fight; but Gerardo refused. (RT 1892-1900.) The defendants continued to challenge and harass the young group. (RT 1899-1900; 2692-2693.) Francis R. attempted to back his car away, but the defendants blocked his path. (RT 1901, 1904.) Defendant Gonzales then grabbed Gerardo's cell phone from his lap. (RT 1902-1904.) Gerardo pleaded to get his phone back, but the defendants refused and told Gerardo they would only give it back if he fought them. (RT 1903-1906.) Defendant Gonzales then grabbed the victim's hat. (RT 1907-1908.) Gerardo then began shutting the door so they could leave and defendant Toscano shot him. (RT 1908-1914; 2394-2399.)

In light of these facts, clearly more force was used than was necessary to acquire the property. The defendants intimidated, harassed, and challenged the victim to fight in order to get his property back. Ultimately, they shot him which enabled them to carry away the property. Likewise, there was ample evidence from which a rational factfinder could determine that the defendants retained the property through fear and intimidation.

In sum, the state court reasonably determined that a fairminded jurist could find more force was used than was necessary to acquire the items, and/or that the defendants retained the property by force, fear, and intimidation. There was more than sufficient evidence to support the robbery conviction and robbery special circumstance. The claim should be rejected.

### 2. Gang Expert

Petitioner alleges that the state court unreasonably rejected his claim that the trial court improperly allowed a gang expert to testify regarding Petitioner's knowledge and intent during commission of the crimes. Specifically, he contends the trial court erroneously allowed the expert to offer his opinion that Petitioner must have known Toscano was carrying a gun. This claim was presented on direct review as well. In the last reasoned decision, the Fifth DCA analyzed the claim as follows:

> Garcia–Santos and Gonzales contend that the trial court erred in permitting the prosecution's gang expert to render, over defense objections, an improper opinion about their subjective knowledge of Toscano's weapon in violation of principles set forth in this court's opinion in *Killebrew, supra*, 103 Cal.App.4th at page 657. Hudson testified in relevant part as follows:

"[THE PROSECUTOR:] Q. Do you have any training about whether or not when one person has a firearm, whether the other gang members know about it?

"[HUDSON:] A. Yes, ma'am.

"Q. What's that training?

"A. Training would include the conferences I spoke about earlier when we go to gang conferences, information passed along during meetings. I've also had training directly related to when I've spoken to actual gang members about whether or not they would be aware of other members possessing guns, what would they expect, what would they do in that situation.

"Q. About how many gang members do you think you've talked to about that?

"A. Dozens. I couldn't give you an exact number, ma'am, but I've talked to—that's one of the primary questions I ask gang members when I speak with them if I can get to that point with talking to them.

"Q. So that's a pretty important concept.

"A. To me it is, yes.

"Q. So you've been trained about that concept and you've talked to gang members about that concept?

"A. Yes, ma'am.

"Q. And have you previously testified about that concept?

"A. Yes, ma'am. [¶] ... [¶]

"Q. I'd like you to assume the following: That we have one gang member going with other gang members to commit a crime, so they're traveling together.

"A. Okay.

"Q. And one gang member is armed. Do rules govern as to whether that gang member who is armed has to tell the others that he is armed?

"A. Yes.

"Q. Tell us about those rules that govern that type of concept.

"A. From my contacts with gang members, they would expect to be told about the firearm to know where it is in case of a defensive or offensive is needed, they would be able to acquire that gun if the person that had it was unable to use it.

"Not only further, they would also expect them to tell them because if they get stopped, they need to know about that gun. Someone in the car might

be on parole, might get charged with it. They're going to discuss that.

"And further, they're going to expect each other to know about it.

"Q. All right. So if one person is armed, generally the other gang members are going to know about it. [¶] ... [¶]

"A. Hypothetically. Generally, yes. [¶] ... [¶]

"Q. Would it be considered, sir, hypothetically, of course, disrespectful if the person who is carrying a gun didn't tell the others about it?

"A. If they were going somewhere together in that situation as I described, yes, it would be considered disrespectful.

"Q. Why would it be disrespectful?

"A. Because you could put the other people in the car in a situation without their knowledge of it.

"Q. And this applies to something—does it apply to more than cars?

"A. Sure. It could apply to if they were all going to a specific location together or meeting somewhere, commonly if someone goes somewhere, especially when you're dealing with a gang, usually the—my experience has been that the individuals, even without having to tell them, will know that they have a gun because they've told them in the past because they usually will brag about it. So everyone's going to know they have a gun in that clique anyways, but they're generally going to tell the people that are in the gang that don't know hey, I've got a gun on me, we're going here. If something happens, this is where it's at.

"Q. Is this true in Sureno street gangs?

"A. Yes, ma'am.

"Q. And specifically the Loma?

"A. Yes, ma'am."

The trial court properly admitted this testimony. "The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. [Citations.] Such evidence is admissible even though it encompasses the ultimate issue in the case." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.) "Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [Citations.] [¶] The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.'" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; see also *People v. Olguin, supra,* at pp. 1369–1370.)

Garcia–Santos and Gonzales contend that, although masked as a hypothetical, Hudson's testimony essentially opined that they each had specific knowledge of

Toscano's weapon, as ruled improper in *Killebrew, supra*, 103 Cal.App.4th at pages 657–658. However, in *Killebrew*, this court drew the crucial distinction between permissible expert testimony as to "the expectations of gang members in general when confronted with a specific action" (*id*. at p. 658) and impermissible testimony as to what a defendant was actually thinking during commission of a crime—the expert "testified to the subjective knowledge and intent of each occupant in each vehicle." (*Id*. at p. 658, italics omitted.) The record does not support appellants' position because, in the challenged instances, Hudson was testifying as to the expectations of a typical gang member in various situations as permitted under *Killebrew*. As this court explained: "Testimony that ... gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed, would have been admissible." (*Killebrew, supra*, 103 Cal.App.4th at p. 658.) The same is true of Hudson's testimony in this case.

Toscano, 2015 WL 5062831, at *15–16.

### a. Legal Standard and Analysis

A federal court in a habeas proceeding does not review questions of state evidence law. Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Therefore, habeas relief is unavailable for Petitioner's claim that the admission of the gang expert's testimony on Petitioner's knowledge concerning Toscano's gun violated state evidentiary law under People v. Killibrew, 103 Cal.App.4th 644 (2002).

Moreover, with respect to the admission of evidence, there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process. In Holley v. Yarborough, the Ninth Circuit stated:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." [Citation omitted.] Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating

16

discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly

established Supreme Court precedent governing a trial court's discretionary decision to admit

evidence as a violation of due process, habeas relief is foreclosed.  Id.  Therefore, Petitioner

cannot demonstrate that the state court decision was contrary to, or involved an unreasonable

application of, clearly established federal law.  See 28 U.S.C. § 2254(d).

Nevertheless, there can be habeas relief for the admission of evidence when the evidence

"is so extremely unfair that its admission violates fundamental conceptions of justice."  Perry v.

New Hampshire, 565 U.S. 228, 237 (2012).  Only if there are no permissible inferences that the

jury may draw from the evidence can its admission rise to the level of a due process violation.  Id.

at 920.  In this case, a fair-minded jurist could find that the gang expert's testimony was not so

extremely unfair as to violate due process.  Contrary to Petitioner's contention, the gang expert

did not testify to Petitioner's subjective knowledge or intent as to whether Toscano was armed.

Rather, he testified about the customs of gang members in general, whether it would be expected

for a gang member to advise other gang members if he were armed, and the consequences for

failing to do so.  The claim should be denied.

3.     CALCRIM No. 400

Petitioner next contends that the state court unreasonably determined that CALCRIM No.

400 did not incorrectly instruct the jury on aiding and abetting.  This claim was presented on

direct review and denied by the Fifth DCA as follows:

> Prior to 2010, CALCRIM No. 400, defining the general principles of aiding and
> abetting, advised that a person is "equally guilty" of a crime whether he or she
> committed the crime personally or aided and abetted the perpetrator. (*People v.
> Samaniego* (2009) 172 Cal.App.4th 1148, 1165 (*Samaniego*), citing former
> CALCRIM No. 400 (2009 rev.).) The "equally guilty" language has since been
> removed from the instruction. (See CALCRIM No. 400 ["A person is guilty of a
> crime whether he or she committed it personally or aided and abetted the
> perpetrator"].) Although the proceedings below were conducted in 2012, the jury
> was instructed pursuant to an outdated version of CALCRIM No. 400. Aguero,
> Garcia–Santos, and Gonzales allege instructional error based on the "equally
> guilty" language that was used in the trial court's explanation of the law
> concerning accomplice liability. [FN10]
>
> > [FN10] The relevant text of the instruction read: "A person is equally
> > guilty of the crime whether he or she committed it personally or aided and
> > abetted the perpetrator."

17

None of the appellants objected to, nor requested modification or clarification of, the challenged instruction. This failure to act should be fatal to their claim since there are several published opinions which hold that a challenge to the "equally guilty" language in former versions of CALCRIM No. 400 is forfeited by a failure to object and/or request clarifying language at the time of trial. (E.g., *People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [addressing challenge to the "equally guilty" language in CALJIC No. 3.00]; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118–1119 (Lopez ) [disapproved on other grounds in *People v. Banks* (2015) 61 Cal.4th 788, 809]; *Samaniego, supra*, 172 Cal.App.4th at p. 1163.). Forfeiture aside, we find the alleged error to be harmless under any standard of prejudice.

The challenged version of CALCRIM No. 400 did not contain an incorrect statement of law. "All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433; accord, § 31 ["All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, ... are principals in any crime so committed"].) Nevertheless, a number of appellate decisions hold that under extraordinary circumstances, the aider and abettor may have a mental state which reflects a lesser level of culpability than that of the direct perpetrator. (See, e.g., *Samaniego, supra*, 172 Cal.App.4th at pp. 1164–1165 ["while generally correct in all but the most exceptional circumstances, [CALCRIM No. 400] is misleading here and should have been modified"].)

According to the California Supreme Court, it is possible for an aider and abettor to be convicted of a crime greater than the offense for which the actual perpetrator is liable. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118–1119, 1122.) In light of this holding, appellate courts have reasoned that the opposite must be true, i.e., an aider and abettor can theoretically be convicted of a lesser crime than the offense for which the actual perpetrator is liable. (*Lopez, supra*, 198 Cal.App.4th at p. 1118; *Nero, supra*, 181 Cal.App.4th at pp. 513–518; *Samaniego, supra*, 172 Cal.App.4th at pp. 1163–1164.) Given these possible outcomes, the "equally guilty" language is potentially misleading insofar as it suggests that the direct perpetrator and the aider and abettor must be found guilty, if at all, of the same crime(s) and degree(s) thereof. However, reversible error stemming from the use of this language has only been found in cases where jurors informed the trial court that they were confused by the instruction, and the court failed to provide adequate clarification in response to their inquiries on the subject. (*People v. Loza* (2012) 207 Cal.App.4th 332, 352–355 (*Loza*); *Nero, supra*, 181 Cal.App.4th at pp. 517–520.)

We do not presume a jury has been misled by an erroneous instruction. To the contrary, "[a] defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68.) Otherwise, we adhere to the presumption that jurors are "able to understand and correlate instructions," and follow the instructions that they are given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) This presumption was rebutted in *Loza* and *Nero, supra*, through evidence which clearly showed that the jurors were confused as to what mental state was required to establish aider and abettor liability. (*Loza, supra*, 207 Cal.App.4th at p. 355 ["the questions this jury asked indicated that despite having been provided instructions from which they should have understood that they were required to consider the intent of the

person accused of aiding and abetting the perpetrator, the jury remained confused as to this issue"]; *Nero, supra,* 181 Cal.App.4th at p. 518 ["where, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be. The trial court, however, by twice rereading CALJIC No. 3.00 [containing the 'equally guilty' language] in response to the jury's question, misinstructed the jury"].) Here, in contrast, the record is devoid of any indication that the jury was confused by the aiding and abetting instructions.

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) A jury instruction is not judged in artificial isolation, but rather from the entire charge of the court and the overall trial record. (*People v. Solomon* (2010) 49 Cal.4th 792, 822; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331.) In this case, the instruction given under CALCRIM No. 400 was immediately followed by a more detailed explanation of the required mens rea for aiding and abetting liability as set forth in CALCRIM No. 401. [FN11.]

> [FN11.] CALCRIM No. 401 instructed the jury: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to have actually been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor. [¶] A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed...."

Considering that the jury was properly instructed under CALCRIM No. 401 and expressed no confusion regarding the "equally guilty" language in CALCRIM No. 400, we are not persuaded that a miscarriage of justice occurred through the use of the latter instruction. (See *Lopez, supra,* 198 Cal.App.4th at pp. 1119–1120 [any error in CALCRIM No. 400's "equally guilty" language was harmless where jury was also instructed with CALCRIM No. 401].) The entirety of the instructions properly informed the jury as to the intent required for aider and abettor culpability. We thus conclude that the inclusion of the phrase "equally guilty" in CALCRIM No. 400 did not constitute reversible error. [FN12.]

> [FN12.] In light of our conclusion, we reject Garcia–Santos's related claim that the prosecutor committed misconduct in closing argument by invoking the "equally guilty" language in CALCRIM No. 400. Garcia–Santos also forfeited this claim by failing to raise it below.

Toscano, 2015 WL 5062831, at *20.

a.  Procedural Default

As an initial matter, Respondent contends that the claim is procedurally barred because no contemporaneous objection was made at trial.  The Court agrees.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief.  Id. at 730.  For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default."  Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to be "independent," it must not be "interwoven with the federal law."  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

In Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit held that California's contemporaneous objection doctrine is clear, well-established, and has been consistently applied when a party has failed to make any objection to the admission of evidence. In Vansickel v. White, 166 F.3d 953 (9th Cir. 1999), the Ninth Circuit held that the contemporaneous objection bar is an adequate and independent state procedural rule.  In this case, neither Petitioner nor his co-defendants objected to the use of CALCRIM No. 400.  Further, Petitioner has not demonstrated cause for the default or actual prejudice resulting therefrom. Thus, the claim is procedurally defaulted.

b.  Legal Standard

Initially, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain

federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law). Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155.

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).

c.  Analysis

In this case, the state court reasonably determined that any error was harmless. The court noted that CALCRIM No. 400, with inclusion of the "equally guilty" language, has been held to be "generally correct in all but the most exceptional circumstances." People v. Samaniego, 172 Cal.App.4th 1148, 1164-65 (2009). No exceptional circumstances were present here. There was no indication the jury had any questions regarding the instruction. In addition, the jury was never

21

instructed that Petitioner's liability had to be the same as the perpetrator's. Rather, the jury was instructed to "separately consider the evidence as it applies to each defendant" and "must decide each charge for each defendant separately." (RT 5824.) Furthermore, as noted by the Fifth DCA, the jury was immediately instructed thereafter with CALCRIM No. 401 which provided a more detailed explanation of the mens rea required for aiding and abetting liability.

Accordingly, Petitioner fails to demonstrate that the state court rejection of his claim was contrary to or an unreasonably application of clearly established Supreme Court precedent.

4.    Natural and Probable Consequences Instruction

Petitioner contends that the state court unreasonably rejected his claim that the jury was erroneously instructed that it could find Petitioner guilty of first degree murder as an aider and abettor under the "natural and probable consequences" theory. The state court determined that the instruction was erroneous, but harmless beyond a reasonable doubt. In rejecting Petitioner's claim, the Fifth DCA stated:

> On June 2, 2014, after the original briefing was completed in this appeal, the California Supreme Court decided *Chiu, supra*, 59 Cal.4th 155. *Chiu* held that a conviction of premeditated murder cannot be based on the theory that the defendant aided and abetted another offense of which premeditated murder was a natural and probable consequence. Since this was one of the theories of first degree murder on which the jury was instructed in this case, Garcia–Santos filed a supplemental opening brief arguing that the instructional error was reversible. Both Gonzales and Aguero have joined in Garcia–Santo's argument.
>
> *Chiu* was accused of urging a confederate to shoot a victim during a fistfight. He admitted he was involved in the fight but denied he knew about the gun or encouraged the shooter to shoot. The victim was shot and killed. (*Chiu, supra*, 59 Cal.4th at p. 160.)
>
> *Chiu's* jury was instructed that if it found Chiu guilty of aiding and abetting the shooter only in the crimes of assault or disturbing the peace, it could still find him guilty of murder if a reasonable person would know that murder was a natural and probable consequence of the commission of the assault or the disturbance of the peace. The jury was further instructed that the murder was of the first degree if the shooter acted willfully, deliberately and with premeditation. (*Chiu, supra*, 59 Cal.4th at pp. 160–161.)
>
> The court instructed the jury on another theory of murder as well: it could find Chiu guilty of murder if it found he directly aided and abetted the shooter in committing murder. Again, the degree of murder would be determined by finding whether the shooter acted willfully, deliberately and with premeditation. (*Chiu, supra*, 59 Cal.4th at pp. 160–161.) The jury returned a verdict against Chiu of first degree murder. (*Id*. at p. 161.)

The Supreme Court held that it was error to allow the jury to find first degree murder on the theory that Chiu aided and abetted a less serious offense of which murder was a natural and probable consequence. In the court's view, it is not appropriate to impose the increased penalties for first degree murder on a defendant who only aided and abetted a lesser offense: "Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the ... public policy concern of deterrence." (*Chiu, supra*, 59 Cal.4th at p. 166.) Consequently, a defendant who aids and abets a lesser crime that would naturally and probably result in murder is guilty only of second degree murder, even if the perpetrator killed with premeditation, provided that the defendant is not guilty of first degree murder under the felony-murder rule set forth in section 189. (*Chiu, supra*, at p. 166.)

The Supreme Court emphasized that its holding did not preclude aider and abettor liability for premeditated murder where the defendant aids and abets murder directly. The mental state component for aiding and abetting consists of knowledge of the perpetrator's unlawful purpose plus intent to aid or encourage commission of the crime. Because this mental state "extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder." (*Chiu, supra*, 59 Cal.4th at p. 167.) Consequently, "[a]n aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent." (*Ibid.*)

The Supreme Court then turned to the question of whether the error was harmless or not. The jury was given both the erroneous instructions allowing it to find premeditated murder based on the natural and probable consequences doctrine, and correct instructions allowing it to find Chiu guilty of aiding and abetting premeditated murder directly. The error would be harmless if the record showed beyond a reasonable doubt that the jury must have relied on the latter, legally valid, theory. (*Chiu, supra*, 59 Cal.4th at p. 167.) The record of discussions between the court and jurors during deliberations showed that the jury apparently was deadlocked at one point on whether to find first degree or second degree murder, and this could have been because of one juror's reluctance to find premeditated murder based on the natural and probable consequences doctrine. Further, the verdict of first degree murder was reached only after that juror was relieved and replaced by an alternate. It followed that the jury could have relied on the erroneous natural and probable consequences instruction, so the error was not harmless beyond a reasonable doubt. (*Id*. at pp. 167–168.)

The court upheld the Court of Appeal's reversal of Chiu's first degree murder conviction. On remand, the prosecution was to be given a choice between accepting a reduction of the conviction to second degree murder and retrying the first degree murder charge under a theory of direct aiding and abetting. (*Chiu, supra*, 59 Cal.4th at p. 168.)

The instructions stating that appellants could be found guilty of murder (and that this murder could be found to be of the first degree) if they aided and abetted another offense of which murder was a natural and probable consequence have the same defect as the instructions held invalid in *Chiu*: They allowed a first degree murder conviction under the natural and probable consequences doctrine based on

aiding and abetting another offense. Under *Chiu*, we must reverse unless the error was harmless beyond a reasonable doubt.

The People point out that, in making the special-circumstance finding under section 190.2, subdivision (a)(22), the jury necessarily determined that appellants intended to kill. [FN13.] We agree with the People's argument that this finding shows the *Chiu* error was harmless beyond a reasonable doubt, for it is compatible only with the theory that they aided and abetted murder directly. The point of giving the jury the natural and probable consequences instructions was to enable it to find appellants guilty of murder even if it believed their intent was only to help Toscano commit the crimes of unlawful assembly, challenging a person to fight, and/or grand theft from the person. Since the jury believed appellants intended to kill, there was no reason for it to resort to that indirect route in finding them guilty of murder. In sum, the findings make it clear that the jury found Aguero, Garcia–Santos, and Gonzales intentionally helped Toscano commit murder. Therefore there is no likelihood the natural and probable consequences instructions caused the jury to reach murder verdicts it otherwise would not have reached.

> [FN13.] Section 190.2, subdivision (a)(22), provides for a punishment of death or life imprisonment without possibility of parole for a first degree murderer who "*intentionally killed the victim* while ... an active participant in a criminal street gang ... and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

Toscano, 2015 WL 5062831, at *21–22.

### a. Legal Standard and Analysis

The same standard set forth in Claim Three above applies here. Accordingly, Petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72. In addition, Petitioner is not entitled to relief unless the instructional error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

Here, the state court reasonably found that any instructional error was harmless under Brecht. As noted by the appellate court, the jury found true the special circumstances allegation that the killing was committed to benefit a criminal street gang. See Cal. Penal Code § 190.2(a)(11). In order to make this finding, the jury had to find that Petitioner "intentionally killed Gerardo Edel Villapudua, Jr." (CT[3] 2370.) By making this finding, the jury concluded that Petitioner harbored the specific intent to kill when he aided and abetted Toscano in the murder of Gerardo. Therefore, any error which could allow the jury to find Petitioner guilty of first degree murder based on the natural and probable consequences theory was harmless beyond a reasonable

---

[3] "CT" refers to the Clerk's Transcript on Appeal.

doubt.

Put another way, under the natural and probable consequences theory, the jury could find Petitioner liable for first degree murder if he had the specific intent to aid in the commission of the crimes of unlawful assembly, challenging to fight, or grand theft from the person. (CT 2327.) By finding true the special allegation, however, the jury found Petitioner harbored a specific intent to kill when he aided and abetted Toscano. Therefore, the jury could not have found him guilty of first degree murder under the natural and probable consequences theory.

Petitioner fails to show that the state court denial of his claim was contrary to or an unreasonable application of Supreme Court authority. The claim should be denied.

**IV.     RECOMMENDATION**

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   __**May 18, 2017**__                 _____**/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE